## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **DIANE PETRAS,** | : | **Hon. Joseph H. Rodriguez** |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 07-170** |
| **v.** | : | |
| | : | |
| **IAP WORLDWIDE SERVICES,** | : | |
| **INC.,** | : | **OPINION** |
| | : | |
| **Defendants.** | : | |

Presently before the Court is Defendant IAP Worldwide Services's motion for summary judgment pursuant to Fed.R.Civ.P. 56 against Plaintiff Diane Petras's claims of disparate treatment in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. (Count I) and discrimination and retaliation in violation of the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601 et seq. (Count IV).[1] The Court has considered the written submissions of the parties and heard oral argument on September 18, 2008.  For the reasons set forth here, and on the record during oral argument, the Defendants' motion is granted in part and denied in part.

### I. Background

Diane Petras ("Petras") was employed by IAP Worldwide Services, Inc. ("IAP")**.** During the time relevant to this motion, Petras worked under supervisor Rick Underwood ("Underwood") at IAP.  The parties in this case vehemently disagree over

---

[1] In her opposition brief, Petras states that she is voluntarily dismissing Count II (NJLAD discrimination) and Count III (negligent hiring, training, retention, and supervision) of the Complaint. See Opp. Br. p. 3.  Petras consented to the dismissal of these claims during oral argument and they are dismissed.

Petras's performance of her assigned duties and the reasons underlying her termination. Despite the very different pictures painted by the parties, what is clear is that Petras and Underwood did not work well together. See Underwood Dep., p. 18. On a motion for summary judgment, the Court is bound to view the facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  From this perspective, the Court will recount the facts of this case.

IAP maintains facilities for the United States Army at Fort Dix, New Jersey, including its roads and grounds and certain mechanical systems.  Def. Facts at ¶ 1.  In August 2004, Petras was hired as a temporary secretary.  Def. Facts ¶ 2.  She was eventually given a permanent appointment and was promoted to "Secretary IV" in May 2005.  Id.  Her duties included providing principal secretarial support to the project manager, various human resources responsibilities, payroll administration, maintaining the Project Manager's calendar, answering telephones, and assuring that paperwork and all correspondence were completed in a timely fashion.  Def. Facts ¶ 3; Pl. Facts ¶ 3.

During her tenure at this position, Petras provided support to several different Project Managers and received favorable performance evaluations.  Def. Facts ¶ 4; Petras Decl. at ¶ ¶ 2-3.  In August 2005, IAP hired Underwood to assume the duties of Project Manager with the goal of making the Fort Dix contract more profitable.  Def. Facts ¶ ¶ 4-5.  Underwood possesses a civil engineering degree and has a military background. Def. Facts ¶ 4.  Immediately, Underwood initiated changes that resulted in the termination and/or resignation of several IAP staffers and performance of the Fort

Dix contract improved.[2] Def. Facts ¶ 5.

IAP claims that Petras's performance under Underwood was poor.  Def. Facts. ¶ 6; Bedford Dep. at 27.   For example, Petras failed to answer the telephone because she was too frequently away from her desk.  Def. Facts ¶7; Underwood Dep. at 27-28.  When at her desk, Petras often socialized and let paperwork pile up.  Id. Petras also relegated her secretarial duties to only a few hours on the weekends.  Id.  In addition, IAP states that certain confidential information that Petras had access to was leaking out of the office and it attributed the leak to Petras.  Id.

An alleged attempt to rehabilitate Petras's performance was made through the implementation of a "Performance Improvement Plan" ("PIP") for Petras.  Def. Facts ¶ 8; Bedford Dep. at 23.  Underwood testified that the PIP was an attempt to rectify perceived deficiencies and to restore a modicum of professionalism to the office.

> I put her on a performance improvement plan because of answering the phone, not being there to answer the phone; not passing on the information of my next meeting; office protocols, eating on the floor of the office with some of her friends, that was not a professional thing to do; and also, all of the traffic kept coming through [her office].  It was turning into a social event . . . everyone would troop through, so this became the social gathering of the project.  Underwood Dep. at 36-38.

Petras not only disputes IAP's characterization of her job performance, but also denies that she ever saw the PIP.  Pl. Facts ¶ 7.  The record includes a draft of the PIP for Petras, but neither Petras nor Underwood signed the document.  Def. Ex. 11.

---

[2]It does not appear that any of these terminations implicated or involved the FMLA or that they were in any way motivated an improper reason.

Underwood testified in detail that Patsy Bedford[3] was at the meeting during which the PIP was delivered to Petras. Underwood Dep. at 37.  However, Bedford had no recollection of such a meeting and Petras disputes that it ever occurred.  Bedford Dep. at 25-26.  But Bedford supports Underwood's assertion that Petras's job performance was on a steady decline and that Petras was frequently absent from work.  Id. at 27.

During the time in which it is alleged that Petras's job performance and attendance were declining, Petras claims that she was suffering from migraines, depression, anxiety disorder, and panic attacks.  Petras Dep. at 16; 36.  Petras's condition was exacerbated by Underwood's demeaning treatment and, at home, she was continually at odds with her son's girlfriend and her ex-husband's girlfriend. Id. at 36.  Petras classified this as "life's situations" stress, id. at 37, and stated that she took personal time to deal with her own health issues and her son's relationship problems.  Id. at 17.

On March 28, 2006, Petras claims that she inquired about or used time under IAP's Employment Assistance program and sought information about the Family Medical Leave Act ("FMLA") policy. Id. at 47-48.  On March 29, 2008 Petras emailed Bedford a list of dates that she planned to be absent from work; including between March 30, 2006- April 22, 2006.  Def Ex. 15.  Initially, the leave was to be taken intermittently and included time for a planned vacation, attending doctor's appointments, and dealing with other family issues.  Id.  Petras also indicated to human resources that she had more planned absences to attend doctor's appointments.  Id.  On

---

[3] Patsy Bedford ("Bedford") is a human resources supervisor.  She typed the PIP for Petras at Underwood's request but denied delivering it to her.  Bedford Dep. at 23-25.

March 30, 2006 Petras filled out her application for FMLA leave.  Petras Dep. at 56; Def. ex. 16.

What happens next is disputed.  IAP claims that on March 31, 2006, after receiving Petras's FMLA application, they suggested that she switch positions with another secretary, Diane Selleny ("Selleny"), because the schedule would better accommodate Petras's absences.  Def. Facts ¶ 17; Underwood Dep. at 40.  IAP maintains that the transfer was a lateral move and did not change Petras's salary.   Def. Facts ¶ 17; Ramsey Decl. ¶ 2.  But after a meeting with Bedford, Petras adamantly refused the transfer and then opted for full time leave.   Def. Facts ¶ 18.

> She said that she was not going to do it, she would not work for the manager that we were transferring her to and she did not want to do that job and she wanted to keep her job, that's what she was hired for and that was the only thing she was going to do.

Bedford Dep. at 45.

An email submitted by IAP confirms that Petras was uneasy about the transfer and asked that Underwood reconsider.  Def. Ex. 18.  Petras also suggests in the email that, in lieu of a transfer, Selleny cover her desk during Petras's intermittent absences. Id.  According to Petras, Bedford suggested that Petras propose to Underwood that Selleny cover her desk during periods of leave.   Pl. Facts ¶ 18.  Petras maintains that the transfer was not a lateral move and was a position covered buy a collective bargaining agreement that was targeted for elimination in the summer.  Moreover, Petras claims that the transfer would hamper her efforts at recovery and that the transfer was driven by Underwood, not Bedford.   Pl. Facts ¶ 17-18; 24.  To avoid the transfer, Petras opted for full time FLMA.  Petras Dep. P. 55.

The parties also dispute the series of events that occurred following Petras's application for FMLA leave. Bedford testified that on April 3, 2006, Petras announced that she was leaving IAP.

> She came into my office, prior to leaving, and I told her that she needed to go and talk to Rick [Underwood]. And she said that she didn't want to talk to him but that she was not going to switch her position. She said that she had packed up her desk and that she was going to leave. Bedford Dep. at 46.

There is a dispute over whether Petras intended to quit at this point. In an email on that same day, Petras informed Bedford that she was leaving her job at 8:30 "to contact [her] counselor to get further assistance." Def. Ex. 19. Bedford sent an email to all personnel that Petras "had switched areas of responsibility effective today" with Selleny. Def. Ex. 20. Petras denies that she intended to leave IAP for good; claiming that her intent was to leave under the FMLA.

Despite Petras's refusal to accept the transfer and the fact that she had cleaned out her desk, IAP did not immediately terminate. Bedford. Dep. at 46. Instead, Bedford conditionally approved Petras's FMLA leave contingent upon receipt of the requested medical certification. Def. Ex. 21. Bedford instructed Petras to have her physician fax her the form as soon as possible. Petras Dep. at 77-78; Bedford Dep. at 54. IAP claims that it never received the medical certification from Petras. Ramsey Decl. ¶5. And Petras admits that she was told on several occasions that she needed to submit her medical certification form to be formally approved for FMLA leave. Petras Dep. at 77, 86-87.

> A. I did. Because I called her every day until she told me I didn't have to call her anymore, because I called in every morning.

Q. So how long was it that you called every morning?
A. I called her in the afternoon.  I called her on the 4th, the 5th, the 6th, and she said: you don't have to call me, I know that you're on FMLA.
Q. In those conversations did she also tell you or remind you to get your medical certification?
A. Yes.

    *       *       *

Q. You knew back in March that you were going to have to provide a medical certification, right?
A. Yes, Mm-hmm.
Q. And after you went out on April 3rd, you've already testified that you had phone conversations with Patsy Bedford, and she reminded you to get medical certification in, correct?
A. Yes, that's correct.
Q. And then just before you went on vacation, you had another phone conversation with Patsy Bedford, correct?
Q. Around April 12th?
A.  I might have right before I went on vacation.  I dropped the forms off on the 6th.  The doctor was on vacation.  He signed them on the 12th.  I picked them up on the 13th and mailed them out on the 14th.  She said: Before you leave, make sure you get them out to me.  Yes, that was the time I talked to her.
Petras Dep. at 77; 86-87.

Petras disputes that IAP never received the certification and submits an affidavit from her physician attesting to the fact that the certification, progress notes and the information contained therein are based upon the physicians personal knowledge. Petras Decl., Ex. A.  Although the certification is filled out and dated April 12, 2006, there is no way of determining the date that the document was mailed to or received by IAP from this offer of evidence.  But Petras maintains that she mailed the certification on April 14, 2006 and that the State of New Jersey received the paperwork on April 19, 2006.  Petras Dep. at 85; Ex. 27.  And Petras states that a representative from IAP corporate human resources confirmed that everything was in place for her FMLA leave. Id. at 111-112.

The record shows that Bedford sent a letter to Petras, dated April 20, 2006[4] stating that the medical certification was due no later than April 27, 2006 upon which time Petras's conditional leave would be revoked.  Bedford Dep. at 65-66.  IAP claims that not only did Petras not respond to the letter, but she had already informed one of her doctors that she had quit her employ.  A doctor's note dated April 6, 2006 from Indrani Sen, M.D., states "Since I last saw her, she has been doing quite well.  **She has quit her job**, which has been causing a significant degree of stress and has applied for a new position."  Def. Ex. 24 (emphasis added).

IAP terminated Petras on May 2, 2006 for failure to come to work for three consecutive days.  Ramsey Decl. at ¶ 4.  Kristina Doggett, a human resources supervisor who by then had replaced Bedford, informed Petras of her termination over the phone.  Petras Dep. at 89.  Petras does not dispute that this was the reason given for her termination.  However, she claims that IAP received the medical certification and that she was improperly terminated while on leave under the FMLA.

Against this factual backdrop, the issues before the Court are two fold.  First, whether summary judgment is warranted on Plaintiff's claim of discrimination based upon disparate treatment under the NJLAD (Count I).  Second, whether summary judgment is warranted for Plaintiff's claim of discrimination and retaliation for requesting leave under the FMLA (Count IV).

## II. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if,

---

[4]This letter was sent during the time Petras was on a vacation. The dates of which were known to Bedford.

viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp., 477 U.S. at 322); accord Fed. R. Civ. P. 56(c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l

Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v.

Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986).  Credibility determinations are the province of the fact finder.  Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. Discussion

### A. COUNT I- Discrimination and Disparate Treatment in Violation of the NJLAD

Count I of the Complaint alleges that IAP discriminated against Petras and

treated her in a disparate fashion because of her disability.  IAP argues for summary

judgment as to this Count alleging that: 1) Petras did not have a recognized disability

under the NJLAD; 2) Petras was not meeting IAP's expectations of performance; 3)

Petras was terminated for legitimate nondiscriminatory reasons, and; 4) there is no

evidence that Petras was treated differently because of her disability.

Analysis of claims made pursuant to the NJLAD generally follow the analysis of

Title VII claims.  Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999).

Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise

to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. The framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), governs Title VII claims, and, by extension, claims under the NJLAD.

Under the McDonnell Douglas paradigm, an employee must first establish by a preponderance of the evidence a prima facie claim of discriminatory discharge under the NJLAD by showing (1) that she was handicapped, (2) that she was otherwise qualified to perform the essential functions of the job, with or without the accommodation by the employer, and was performing at a level that met the employer's expectations, (3) that she nevertheless was fired, and (4) that the employer sought someone to perform the same work after she left. Muller v. Exxon Research & Eng'g Co., 786 A.2d 143 (N.J. Super. Ct. App. Div. 2001) (citing Clowes v. Terminix Int'l, Inc., 538 A.2d 794 (1988)). Then, the burden shifts to the employer to produce evidence demonstrating that the termination was "for a legitimate, nondiscriminatory reason. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the defendant meets this burden, the presumption of discrimination drops from the case, and the burden shifts to the plaintiff to prove by a preponderance of the evidence that the stated reason was pretextual. Id. at 260; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993).

In evaluating employment cases, the task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose. Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 525-27 (3d Cir. 1992). Thus, to establish pretext, "the

-11-

plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the ... plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employers's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer' did not act for [the asserted] nondiscriminatory reasons." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir.1994) (internal citations omitted); <u>Romano v. Brown & Williamson Tobacco Corp.</u>, 284 N.J.Super. 543, 551 (citing <u>Fuentes</u>, 32 F.3d at 764-65).

Defendant claims that summary judgment is warranted because Plaintiff cannot establish any of the elements of a *prima facie* case under the NJLAD. The Court will address each element in turn.

**1. Prima Facie Case of Discrimination Under the NJLAD**

**a. Whether Plaintiff has a recognized disability under the NJLAD**

Pursuant to N.J.S.A. § 10:5-5(q), disability under the NJLAD can come in the form of both physical and non-physical ailments. Plaintiff claims that she suffered from job stress; a non-physical ailment. She has also characterized her ailments as anxiety and depression and provided an affidavit from her physician with appended progress notes detailing various ailments, including depression and migraine headaches. Petras Decl. Ex. A. To prove the existence of a non-physical ailment, a plaintiff must prove that she is suffering "1) from any mental, psychological or developmental disability 2) resulting from an anatomical, psychological, physiological or neurological condition that either a) prevents the normal exercise of any bodily or mental functions or b) is

demonstrable medically or psychologically, by accepted clinical or laboratory diagnostic techniques." Viscik v. Fowler Equipment Co., 800 A.2d 826, 834 (N.J. 2002)(citations omitted).

The scope and onset of Plaintiff's claimed disabilities are disputed. Plaintiff claims that her disability is work related job stress. See Opp. Br. at 7. In her Declaration, she attests that prior to being supervised by Underwood, she suffered from migraine headaches. Petras Decl. at 5. Underwood's "abusive conduct toward [her] and his efforts to subvert [her] job performance . . ." exacerbated her medical conditions. Id. During her deposition Petras claimed that she suffered from both depression and stress which were not present when she was hired by IAP, but presented in February 2006.

> A. Count I of the Complaint alleges disability discrimination. Its on Page 4 for your reference. Can you tell me what your disability was?
> A. Stress.
> Q. Anything else?
> A. Depression.
> Q. Anything else?
> A. Well, all the– actually, everything that goes with stress and depression, whereas, headaches, I was feeling sick to my stomach anxiety, panic attacks, et cetera. That goes along with those factors.
> Q. Do you still have this disability?
> A. No.
> Q. When did the disability start?
>     Retract that. At the time that you were first hired by IAP, did you have a disability?
> A. It started to begin around February [2006] when I requested my FMLA documents and forms to be filled out from the HR supervisor or manager, Patsy Bedford.
> Petras Dep. pp. 16-17.

Petras contends that IAP misapplies the ADA disability standard to her ailments, which is more restrictive. The NJLAD disability standard only requires showing a interference with a major life activity. The NJLAD defines a "handicapped" person as

-13-

one suffering from a "physical disability ... or from any mental, psychological, or developmental disability ... which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." N.J.S.A. § 10:5-5(q).  Unlike the ADA's definition, the NJLAD's definition of  "handicapped" is very broad in its scope and the New Jersey Supreme Court directs that the Act be construed liberally. Id. at 590, 538 A.2d 794.

The NJLAD does not define the specific conditions that fall within its purview. Clowes, 109 N.J. 593.  The parties disagree on whether the NLAD is broad enough to encompass Petras's ailments.  On this point, the parties debate the applicability of Judge Fisher's opinion in Gaul v. AT&T, Inc., 955 F.Supp. 346 (D.N.J. 1997).  But in Gaul, the Court never reached the issue of whether "depression and stress disorders are handicaps within the meaning of the NJLAD."  955 F.Supp. at 353.  And at the time Gaul was decided, this district had at least one opinion which "suggested that stress and depression do not constitute handicaps cognizable under the NJLAD." Id. (citing Alm v. Marriott Corporation, 1991 WL 313897 (D.N.J.1991)).  On the heels of Gaul, Judge Fisher issued his opinion in Olsen v. General Elec. Astrospace which definitively included "depression and mental illness" as handicaps within the meaning of the NJLAD.  966 F.Supp. 312, 315 (1997)("Accordingly, while the New Jersey courts have not yet addressed the issues of depression and mental illness, the application of their rationales in the cases cited leads to the conclusion that these ailments constitute handicaps within the meaning of the LAD."); see also D.G. v. Somerset Hills School District, 559 F.Supp.2d 484, 502 (D.N.J. 2008)(qualifying major depression as a disability under the NJLAD).

In addition, the New Jersey Appellate Division's decision in <u>Tynan v. Vicinage 13 of the Superior Court of New Jersey</u>, 351 N.J. Super. 385 (2002) is instructive.  In that case, plaintiff had a history of migraines, irritable bowel syndrome, and other psychological maladies associated with stress that existed **prior** to being supervised by one of the defendants, Pardo.  <u>Id</u>. Pardo's supervision of Tynan "exacerbated" these conditions, much like the alleged effect of Underwood's supervision of Petras.  Noting that Tynan was entitled to all favorable inferences, the <u>Tynan</u> court considered her physician's assessment of her disability as sufficient to withstand summary judgment.

And like the plaintiff in <u>Tynan</u>, Petras submits an Affidavit from her treating physician, Dr. Joseph Termini, M.D. with appended progress notes that mention anxiety disorder, depression, and migraine headaches. Petras Decl., Ex A.   The progress note for April 21, 2005 notes that Petras is taking Zoloft, an anti-depressant, and that she suffers from a "major headache."  <u>Id</u>.  The July 11, 2005 progress note lists "Depression-1997" in the medical history.  <u>Id</u>.  But both of the aforementioned progress notes do not mention depression as the reason for the office visit.  Such a notation is not made until the April 12, 2006 progress note, which states that Petras "[h]as been seeing [a] counselor for stress/ depression" and adds that disability forms need to be filled out.  <u>Id</u>.

The Affidavit of Petras's treating physician satisfies the requirement of expert testimony pronounced in <u>Clowes</u>. 109 N.J. at 597. ("expert medical testimony is required to establish the fact of the employee's [handicap]."); <u>See</u> <u>also</u> <u>Gaul</u>, 955 F.Supp. at 349.  Her doctor's notes list the existence of migraines, depression and some of the other maladies prior to Underwood's tenure.  In addition, Petras details her ailments and their manifestation during her deposition.  Giving Plaintiff all reasonable inferences, there is

a genuine issue of fact as to whether she suffers from these ailments, whether they were exacerbated by her work situation and therefore, whether she has a recognized disability under the NJLAD.

### b. Petras Was Not Meeting IAP's Expectations of Performance

Prior to Underwood's arrival, Petras was given favorable performance evaluations, assigned additional duties, and even promoted.  The record includes a draft of the PIP for Petras, but neither Petras nor Underwood signed the document.  Def. Ex. 11.  Underwood testified that Patsy Bedford was at the meeting during which the PIP was delivered to Petras. Underwood Dep at 37.  However, Bedford had no recollection of such a meeting and Petras disputes that it ever occurred.  Bedford Dep. at 25-26.  Petras disputes IAP's characterization of her job performance and denies that she ever saw the PIP or that it was delivered to her.  Pl. Facts ¶ 7.  Although Bedford contradicts Underwood regarding the delivery of the IAP to Petras, Bedford supports Underwood's assertion that Petras's job performance was on a steady decline and that Petras was frequently absent from work.  Id. at 27.

Nevertheless, the fact that the PIP was never signed undermines its value and calls into question the credibility of Underwood.  But, Petras was not terminated for poor job performance and IAP does not dispute this criterion, nor the remainder of the *prima facie* considerations.  Def. Reply Br. at 5.  Thus, the burden shifts to IAP.

### 2. Whether Petras Was Terminated for a Legitimate Nondiscriminatory Reason

IAP puts forth evidence of poor job performance, excessive absences and job abandonment.  But the reason given for the termination was Petras's unauthorized

absences after she allegedly failed to timely submit her medical certification for FMLA. There is a genuine issue of fact regarding whether IAP received Petras's medical certification form, which as will be discusses infra., and, therefore, whether the proffered reason is legitimate.  The burden then shifts to Plaintiff to prove this reason is a pretext for discrimination.

### 3. Whether the Reason Given for the Termination is Pretextual

As a primary matter, there is no evidence that IAP was aware of Petras's alleged disability prior to her request to take FMLA leave.  And it is unclear whether they knew the nature of her underlying medical condition at the time that she requested leave under the Family Medical Leave Act.  In addition, there is no evidence that her application for FMLA leave was treated differently from other employees who requested leave.

Petras attempts to compare her situation with another employee at IAP who took leave after a car accident.  John Erickson was an IAP heavy duty mechanic who requested leave in February 2006.  Ramsey Decl. ¶2 and attachment A.  According to Linda Ramsey (Senior Employee Relations manager), Erickson asked for leave after a car accident and submitted his medical certification one week later.  Id. at attachment B. Petras maintains that she called Erickson daily to make certain that the medical certification form was timely received by IAP.  And it appears that Erickson's form was received by IAP within the fifteen day time limit. Ramsey Decl. ¶2.  The gravamen of Plaintiff's claim in this regard appears to be that she was treated differently from Erickson.

-17-

There is no evidence that Plaintiff was treated any differently.  She acknowledges being in touch with IAP for several days, from April 3 through April 6, 2006, during the beginning of her leave.  Petras Dep. at p. 27.  Petras agrees that she had an additional conversation with Bedford before she left for vacation during which Bedford reminded her to submit her medical certification form.  Id. at p. 86.  Petras did not even get the form signed until April 12, 2006, as her physician was unavailable until that date.  Id.  And she alleges to have mailed the forms on April 14, 2006.  Id.  At this point it is unclear what Petras would have done differently if IAP was not in constant contact, as Petras contends.

IAP sent Petras a letter dated April 20, 2006 again requesting the forms and warning of the consequences of noncompliance.  Ex. 23.  Petras was terminated because IAP claims to have never received the form and it considered her absences as evidence of job abandonment.  Ex. 26.  Petras was given an extension by Bedford before her vacation and IAP did not terminate Petras until several days after the April 27, 2006- the extended deadline.

Even giving Plaintiff every favorable inference, there is no evidence that the termination was motivated by an intent to discriminate against her because of her alleged disability.  Moreover, Plaintiff's claims that IAP's attempt to transfer her to another position is evidence of discrimination misses the mark.  Initially, Plaintiff requested intermittent leave.  As such, the statute governing intermittent leave permits transfers and provides:

> (2)If an employee requests intermittent leave, or leave on a reduced leave schedule, under subparagraph (C) or (D) of subsection (a)(1) of this section or under subsection (a)(3) of this section, that is foreseeable based on planned

medical treatment, the employer may require such employee to transfer temporarily to an available alternative position offered by the employer for which the employee is qualified and that--
(A) has equivalent pay and benefits; and
(B) better accommodates recurring periods of leave than the regular employment position of the employee.

29 U.S.C. § 2612(b)(2); see also 29 C.F.R. § 825.204(a).  The Code of Federal

Regulations explains that the transfer may be to a position governed by a collective

bargaining agreement.  It provides:

Transfer to an alternative position may require compliance with any applicable collective bargaining agreement, federal law (such as the Americans with Disabilities Act), and State law. Transfer to an alternative position may include altering an existing job to better accommodate the employee's need for intermittent or reduced leave.

29 C.F.R.§ 825.204(b).

Thus, the transfer was consistent with the regulations and statutes governing the

Family Medical Leave Act and there is no evidence it was motivated by discriminatory

animus.  Likewise, Plaintiff has failed to identify any evidence in the record indicating

that her termination was motivated by an intent to discriminate against her because of

her alleged disability.  Summary judgment as to Count I is GRANTED.[5]

_____

[5]To the extent that Petras claims failure to accommodate, summary judgment still results. Plaintiff alludes in her Opposition Brief that IAP could have had someone cover her desk in her absence, to avoid the transfer.  As discussed above, IAP was within its rights to reassign Plaintiff and an employer need not "acquiesce[] to the employee's every demand."  Tynan, 351 N.J. Super. at 397. Job reassignment is within the purview of "reasonable accommodation."  NJ ADC 13:13-2.5(b).   Petras rejected the reassignment and IAP fulfilled its obligation in that regard.  See Jones v. Aluminum Shapes, Inc. 339 N.J.Super. 412, 428 (2001)(quoting Smith v. Midland Brake, 180 F.3d 1154 (10th Cir. 1999)("[T]he employer is free to choose the reassignment that is to be offered to the qualified individual with a disability. If the disabled individual rejects that assignment, the employer is under no obligation to continue offering other assignments ... Once the employer has offered such a reassignment, its duties have been discharged.")

**B. COUNT IV- Discrimination and Retaliation For Requesting Leave
Under the FMLA**

Count IV of Petras's Complaint alleges that she was discharged in retaliation for taking leave protected by the Family Medical Leave Act.  The purposes of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, are to "balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1) and (2).  To those ends, the FMLA requires that "an eligible employee shall be entitled to a total of twelve workweeks of leave during any twelve month period" if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

"To trigger the application of the FMLA, an employee must provide his employer with notice that leave is necessary."  Johnson v. Thru Point, Inc., 160 Fed. Appx. 159, 162 (3d Cir. 2005)  (citing 29 C.F.R. § 825.303 and holding that the plaintiff had not put his employer on notice of his need for health-related leave because he neither advised his employer of a medical condition nor provided the employer with an opportunity to discover it).  The Code of Federal Regulations states that:

> [a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.  The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only that leave is needed for an expected birth or adoption, for example.

29 C.F.R. § 825.302(c) (2006).  Therefore, "[t]o trigger the rights guaranteed under the FMLA, an employee need not actually mention the FMLA by name, "the critical question

-20-

is whether the information imparted to the employer is sufficient to <u>reasonably apprise</u> it of the employee's request to take time off for a serious health condition." <u>Holpp v. Integrated Commc'ns Corp.</u>, Civ. No. 03-3383, 2005 WL 3479682, at *5 (D.N.J. December 20, 2005) (quoting <u>Brohm v. JH Props.</u>, 149 F.3d 517, 523 (6th Cir. 1998)) (emphasis added).  Moreover, 29 C.F.R. § 825.302(c) requires an employer to "inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c) (2006).

The FMLA further provides:

> [i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a)(2) (1993).  On the other hand, if an employee is discharged during a protected leave for a reason unrelated to the leave, there is no right to reinstatement. <u>Conoshenti v. Public Service Elec. & Gas Co.</u>, 364 F.3d 135, 141 (3d Cir. 2004) (citing 29 C.F.R. § 825.216(a)(1)).  <u>See also</u> <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 272 (2001).

In cases alleging retaliation in the employment setting, courts generally apply the burden-shifting framework established in <u>McDonnell Douglas Corp.</u>, 411 U.S. at 800-06, discussed <u>supra</u>.

### 1. Prima facie case of discrimination

To establish a prima facie claim of retaliation for requesting FMLA leave, a plaintiff must show that: (1) she engaged in protected activity (taking FMLA leave); (2) she suffered an adverse employment decision; and (3) the adverse decision was causally

related to the leave.  Conoshenti, 364 F.3d at 146-47.  Temporal proximity between the protected activity and adverse employment action may be used as circumstantial evidence to infer causation.  See Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1977).  However, an employer is not required to suspend its termination proceedings just because the employee requests medical leave.  See, e.g., Clark County Sch. Dist., 532 U.S. at 272.  "A contrary holding might impede employers from permissible terminations and encourage employees aware of an impending termination to attempt to create their own 'severance package.'" Windfelder v. The May Dep't Stores Co., 93 Fed. Appx. 351, 355 (3d Cir. 2004).

As a primary matter, the IAP's contention that job stress is not covered under the FMLA because it requires unscheduled and unpredictable absences is disingenuous. Plaintiff has claimed job stress, but points out that the job stress exacerbated a preexisting condition of depression and migraine headaches.  See discussion Count I Section (A)(1), supra.  Collins v. NTN-Bower, Corp., 272 F.3d 1006, 1006 (7th Cir. 2001), cited for support by IAP does not hold that job stress or depression are excluded from coverage under the FMLA and is both inapplicable and unpersuasive.  Depression can be a recognized disability under the FMLA.  See Scamihorn v. General Truck Drivers, 282 F.3d 1078, 1084-85 (9th Cir. 2002).

The FMLA defines "serious health condition" as

 "an illness, injury, impairment, or physical or mental condition that involves ... (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or(B) Treatment by a health care provider at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider. (2)[a]ny period of incapacity

> requiring absence from work, school, or other regular daily activities, of more than three calendar days, that also involves continuing treatment by (or under the supervision of) a health care provider. 29 C.F.R. § 825.114(a)(2)(i)(A)(B).

Mental health conditions are included in this definition as long as the employee is receiving continual treatment by a health care provider. 29 U.S.C. § 2611(11)(B).  In assessing whether a condition meets this definition, the FMLA's legislative history directs that "[t]he definition of 'serious health condition' ... is broad and intended to cover various types of physical and mental conditions." <u>Scamihorn</u>, 282 F.3d at 1084-85 (quoting S.Rep. No. 103-3, at 28 (1993), reprinted in 1993 U.S.C.C.A.N. at 30.)

Here, Plaintiff has supplied her medical records certified by her physician in addition to a copy of the medical certification justifying the need for medical leave.   For purposes of the FMLA, Plaintiff has shown enough to overcome summary judgment on that basis.

Plaintiff was fired and the decision to terminate was causally connected to her attempt to take leave under the FMLA.  Therefore, she has established a *prima facie* case of retaliation under the FMLA.  The burden now shift to IAP to show a legitimate nondiscriminatory reason for Plaintiff's termination.

### 2.  IAP Claims Petras Abandoned Her Position

IAP claims it fired Petras for failing to report to work for more than three days, which constitutes job abandonment and grounds for termination.  If in fact IAP never received the medical certification form, then this constitutes a legitimate nondiscriminatory reason for Petras's termination.

### 3. Whether IAP's Proffered Reason Is a Pretext to Discrimination

Whether IAP's justification for Petras's termination is a pretext for

discrimination, centers on whether Petras complied with the FMLA's medical

certification provisions.  The Code of Federal Regulations states that:

> (b) When the leave is foreseeable and at least 30 days notice has been
> provided, the employee should provide the medical certification before the
> leave begins. When this is not possible, the employee must provide the
> requested certification to the employer within the time frame requested by
> the employer (which must allow at least 15 calendar days after the
> employer's request), unless it is not practicable under the particular
> circumstances to do so despite the employee's diligent, good faith efforts.

The statute governing certification provision is permissive and leaves the decision

of requiring a certification to the employer.  29 U.S.C. § 2613(a)(employer "may" require

a medical certification).   IAP requested a certification form from Petras, consistent with

the FMLA and its own employee manual which both state when an employer requests

medical certification, the employee must submit it within fifteen (15) days.  Ex. 12, p.7.

Failure to submit the certification is grounds for revoking the FMLA leave and may

subject the employee to other consequences consistent with an employer's attendance

policies.  There are several cases where courts have granted summary judgment in favor

of an employer where the employee failed to timely submit a requested medical

certification.  See, e.g., Lipscomb v. Electronic Data Systems Corporation, 2008 WL

1813157 (3d Cir. April 23, 2008)( Where the Plaintiff failed to timely supply her medical

certification under the FMLA, summary judgment was granted.)  Here, IAP claims that

Petras's failure to provide the medical certification within the requested time period

caused her FMLA leave to be revoked, resulting in unexcused absences.  These absences

were the basis of her termination for "job abandonment".

The following facts are relevant to the discussion.  On March 29, 2006, Petras

emailed Bedford with a list of dates that she was seeking to take intermittent leave and also faxed a medical certification form to her Social Worker. Ex. 15, 14. On March 30, 2006 Petras completed IAP's Application for leave to commence on April 4, 2006. Ex. 21. Since the Social Worker was not authorized to sign the form, Petras states that she hand delivered the form to her physician, Dr. Termini, who signed the form on April 12, 2006. (Petras Dep. p.86; Petras Decl., Aff. Joseph Termini, M.D.). Petras contends that she mailed the form on April 14, 2006, the day before she left for a planned vacation. Petras Dep. at p. 85. In addition to mailing the certification to IAP, Petras claims that she also sent the form to the New Jersey Department of Labor in support of her application for Temporary Disability Insurance. Id. The Department of Labor time stamped this application as received on April 19, 2006. Ex. 27. The application references an attached medical certification, but it is not provided as part of the exhibit. Id.

The parties agree that Petras and Bedford spoke a few times in early April 2006 regarding Petras's leave of absence and the need to submit a medical certification in support thereof. Bedford states that she spoke to Petras shortly before her planned vacation on April 15, 2006, and again reminded her of the need to submit the medical certification form. Bedford Dep. p. 56. According to Bedford, Petras told her she would ensure that IAP had the certification when she returned from vacation, on April 22, 2006, and Bedford said that would be fine. Id. (Bedford tells Petras it is fine if she submits her medical certification upon her return from vacation.)

Bedford entered Petras as being on leave in IAP's database even though it was only conditionally approved pending receipt of the medical certification form, and the

personnel action form she signed bears her signature on April 14, 2006.  Ex. 22.  And the time stamp of IAP's Human Resources indicates receipt of the form on April 17, 2006 and entry into the system on April 18, 2006.  Id.  The series of events that transpires next is also disputed.

Bedford contends that she left Petras repeated messages about the certification; Petras denies that she ever received and phone calls or voice -mails from anyone at IAP. In fact, Petras claims that she called IAP to check on her leave status and that she was never able to reach anyone by phone and that she left messages which were never returned.  At times, Petras's deposition testimony is inconsistent with her pleadings. This is especially true regarding the timing of her phone call to "corporate" to check on the status of her leave and being told that "she was in the system".  Much of this testimony centers on a letter signed by Bedford dated April 20, 2006, which asserts that IAP is still in need of a medical certification form.  The letter explains that if the certification was not received by IAP by April 27, 2006, Petras's leave would be revoked.

After receiving the letter, Petras called corporate to confirm her status and was told that she was noted in the system as being on FMLA.  According to Petras, this caused her to disregard the April 20, 2006 letter.  But in her pleadings, Petras claims that she called corporate "on or about April 17, 2006", which is before the April 20, 2006 letter was generated.  Defendant asserts that these inconsistencies are dispositive. The Court disagrees.

While the inconsistencies are relevant to the inquiry of whether Petras timely submitted her medical certification form, a genuine issue of fact remains.  Specifically, a jury will have to determine why Petras would get a medical certification form filled out

by her doctor, send it to the New Jersey Department of Labor (giving her the reasonable inference that the certification was attached to the application for Temporary Disability Insurance), and not send the form to IAP.  At some point Petras was told that she was in the system on leave- given that she was entered in the system as on leave on April 17 or 18, 2006, when this phone call occurred is a genuine issue of fact. And these facts are what distinguishes this case from Lipscomb.

In that case, defendant sent plaintiff five letters notifying Plaintiff of the requirement to submit her medical documentation to CIGNA; plaintiff never responded to the letters and did not supply the necessary medical certifications.  As a result, defendant terminated her for excessive absenteeism.  Unlike the present case, there was no dispute in Lipscomb that the employer never received the medical certification form.[6]

As discussed in section III(A), supra., Plaintiff has to come forward with more than a mistake.  While this is a close case, giving Plaintiff all favorable inferences, a reasonable jury could conclude that Petras was terminated in retaliation for taking leave under the FMLA.  For these reasons, summary judgment is denied on this count.

## IV. Conclusion

For the reasons stated herein, summary judgment is granted as to Plaintiff's claim of disparate treatment in violation of the New Jersey Law Against Discrimination (Count I) and denied as to Plaintiff's claims of discrimination and retaliation in violation

---

[6]Petras contends that the Lipsomb court reached the wrong result in that case because the remedy for failing to supply the certification is to suspend the FMLA leave-not to terminate the employee.  ) Petras cites Badgett v. Federal Express Corp., 378 F.Supp.2d 613 (M.D.N.C. 2005) for support.  The Court will not address the decision in Badgett, which is not controlling in this case.

of the Family Medical Leave Act (Count IV).  An appropriate Order will issue.


Dated: December 23, 2008.

                                        /s/ Joseph H. Rodriguez
_____
                                        HON. JOSEPH H. RODRIGUEZ,
                                        United States District Judge